**Robert Lee HOLLIS, Movant,**

v.

**COMMONWEALTH of Kentucky, Respondent.**

Supreme Court of Kentucky.

March 30, 1983.

As Modified on Denial of Rehearing July 6, 1983.

Jack E. Farley, Public Advocate, Frankfort, C. Thomas Hectus, Gittleman & Barber, Louisville, for movant.

Steven L. Beshear, Atty. Gen., Eddie C. Lovelace, Sp. Asst. Atty. Gen., Penny R. Warren, Asst. Atty. Gen., Frankfort, for respondent.

Nan D. Hunter, New York City, Thomas Hogan, Louisville, for amicus curiae, American Civil Liberties Union Foundation.

LEIBSON, Justice.

Robert Lee Hollis is charged with murder in violation of KRS 507.020. This is a statutory offense committed when one intentionally or, under circumstances manifesting extreme indifference to human life, wantonly causes "the death of another person." The victim in this case was a fetus, alleged to be some 28–30 weeks old, carried in the body of Hollis' estranged wife.

Our decision is limited to whether Hollis can be charged with violating this statute. Thus limited, the issue is: Can a person who kills a viable fetus, at *this* time and under the statutes of *this* state, be charged with "Criminal Homicide" as set out in Chapter 507 of the Kentucky Revised Statutes? The much larger metaphysical question of "WHEN DOES LIFE BEGIN?" is *not* the subject of this opinion.

These questions bear upon our decision in this case: first, historically, what is included in the common law definition of murder; second, what is the impact of United States Supreme Court decisions interpreting the Constitution of the United States on our decision; and, third, using recognized rules of statutory construction, what is included within the word "person" as used in KRS 507.020?

The Commonwealth intends to prove that Hollis went to the home of his wife's parents, where she was staying, took her from that home out to the barn, told her he did not want a baby, and then forced his hand up her vagina intending to destroy the child and deliver the fetus. The medical evidence in the record by deposition is that the

fetus was killed and the mother's uterus and vagina substantially damaged. The doctor delivered the dead fetus by abdominal incision. In separate indictments Hollis was charged with murder "of the unborn infant child" and assault in the first degree on his estranged wife. The first question in this case is whether Hollis can be charged with murder for causing the death of the fetus. But we are also confronted with the question of whether Hollis can be charged with two offenses, one in connection with the fetus and a separate one in connection with the mother.

The trial court dismissed the murder indictment, reasoning that destroying the life of a viable fetus was not considered murdering a person at common law and that the statutory definition of murder did not enlarge the scope of the word "person." The Kentucky Court of Appeals reversed the decision of the trial court, reasoning that Kentucky now permits recovery in damages in civil cases for the wrongful death of a viable fetus and that it "cannot perceive any sound reason why it should have any less status when it becomes an alleged murder victim." (Court of Appeals' Opinion, p. 70.)

The Commonwealth concedes that historically, at common law, "a conviction of homicide was not possible ... unless the infant had been born alive." (Respondent's Brief, p. 12). This Court recognized this principal in *Jackson v. Commonwealth*, 265 Ky. 295, 96 S.W.2d 1014 (1936), where the mother was charged with murdering her child at birth and the issue on appeal was whether there was evidence sufficient to establish "that the child was born alive." In *Jackson*, quoting earlier authority, we stated:

"In the absence of proof that the child had ever breathed or was alive at birth a conviction cannot be sustained. It is necessary for the Commonwealth to prove affirmatively, not only that the child had breathed, because that might occur during birth, but that it had had a complete and seperate (sic.) existence of its own after birth.... When the evidence that the child was born alive is susceptible of doubt, a conviction can not be sustained."

The position of the Commonwealth is that, by the process of evolution, the status of a fetus has so changed in the eyes of society, and of the law as expressed by the United States Supreme Court, that a viable fetus is a "person" for purposes of criminal homicide. While this argument may appeal to us instinctively, it cannot stand up to the rule of law which both guides and restrains our hand.

We are cited to decisions from nineteen sister states holding to judicial insistence on proof that life existed separate from the mother to establish a charge of criminal homicide. A number of these decisions are quite recent. Nine were decided after the publication of the United States Supreme Court decision in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), relied on by the Commonwealth as the keystone for the claim that a viable fetus now has status as a victim of criminal homicide. The Commonwealth has cited us to no case in any of our sister states in conflict with these nineteen decisions denying such status. All of these decisions reaffirm the born alive requirement for a prosecution for murder.

The United States Supreme Court decision in *Roe, supra,* is *not* authority for the proposition that a viable fetus should be considered a "person" whose life is entitled to constitutional protection, much less for the proposition that the killing of a viable fetus must be regarded as murder. The thrust of *Roe* was from the opposite direction, that no state can prohibit terminating the life of a fetus, regarded by many as human life at any stage of its development, until the final trimester of pregnancy, and not even then when necessary to protect maternal life or health. Thus the "health of the mother" is afforded constitutionally protected precedence over the "life" of the fetus. The decision in *Roe* is simply that a woman's decision whether or not to terminate pregnancy is protected by the Due Process Clause of the Fourteenth Amendment, to such extent that the state has no "compelling" interest permitting it to make

abortion unlawful until the third trimester of pregnancy, the point at which the fetus becomes viable.

The thrust of *Roe* is to declare that the mother's right to privacy in the early stages of her pregnancy, and her health in the last stage of pregnancy when the fetus is viable, have constitutional protection before the life of the fetus, so that the state must not interfere in the abortion process. *Roe* states at p. 163, 93 S.Ct. at p. 732:

> "If the State is interested in protecting fetal life after viability, it may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother."

This is hardly a basis for reasoning that *Roe* gives a viable fetus status as a person whose life is implicitly protected by the murder statute. It is fundamental that this Court has no authority to disagree with a decision of the United States Supreme Court interpreting the Federal Constitution.

Viewed in the context of *Roe*, Kentucky has a "compelling" interest in the life of the fetus when it reaches the stage of viability sufficient to legislate legal sanctions punishing those who destroy it, subject to the limitations that such sanctions shall not apply where the life or health of the mother is involved. Further, under *Roe*, Kentucky has the right to regulate the manner in which abortions shall be performed in the second trimester of pregnancy. To declare that it has done so by the murder statute, KRS 507.020, is totally inconsistent with any rational interpretation of that statute. The statute makes no effort to define the word "person," leading to only one conclusion, that it should be interpreted in conformity with the law regarding criminal homicide as it existed at the time when the statute was passed. We have already discussed what that law is—*Jackson v. Commonwealth, supra.*

The decision of this court in *Mitchell v. Couch*, Ky., 285 S.W.2d 901 (1955), recognizing a civil action for causing death of a viable fetus, did not indicate an intention to change the criminal law. That change in the civil law was in line with similar rulings in many states recognizing that a viable fetus is a valuable entity, so that a person destroying it should pay damages for the life destroyed. The claim is on behalf of the personal representative, for the benefit of the parents or heirs who have suffered the loss. None of the states which have recognized this civil cause of action have suggested that the state should impose sanctions for criminal homicide by reason thereof. In this state, where criminal sanctions are supposed to flow from the Kentucky Penal Code rather than evolving out of court decisions, it would be fundamental error to create a crime in the absence of a statute based on destroying the life of a viable fetus.

When we turn to the Kentucky Penal Code, we find that although "person" is not defined in the chapter related to "Criminal Homicide" the Commentary refers repeatedly to the *Model Penal Code* published by American Law Institute in 1962. The Commentary to the *Model Penal Code* states:

> "The effect of this language is to continue the common-law rule limiting criminal homicide to the killing of one who has been born alive. Several modern statutes follow the Model Code in making this limitation explicit. Others are silent on the point, but absent express statement to the contrary, they too may be expected to carry forward the common-law approach."

This Court cannot presume that the legislature intended to license us to expand the class of persons who could be treated as victims of criminal homicide as we should deem appropriate in our own discretion. Appellate courts in Illinois, Michigan and Rhode Island have all dismissed indictments for the murder of a fetus despite earlier decisions granting civil recovery in a wrongful death proceeding. As the Michigan court said in *People v. Guthrie*, 97 Mich.App. 226, 293 N.W.2d 775, 778 (Mich. Ct.App.1980), "It is one thing to mold, change and even reverse established principles of common law in civil matters. It is

quite another to do so in regard to criminal statutes."

There are other problems which arise if this Court is to include the unborn as persons who can be considered victims of criminal homicide. Although it is well recognized medically that a normal, healthy fetus in the third trimester of pregnancy has a potential of sustaining life outside the body of the mother, it is quite another matter to say that a particular fetus was viable at the time it was terminated or that a particular defendant knew, or should have known beyond a reasonable doubt, that he was killing a viable fetus.

Movant maintains with some justification that if the word "person," as used in the statute, includes a viable fetus, the status of being unborn would render the statute unconstitutionally vague, citing *Lanzetta v. New Jersey*, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939); *Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926), and other cases.

In *Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), the Court found that a Pennsylvania statute which required a person who performed an abortion to take measures to preserve the life of any fetus that was "viable" was void for vagueness due to the uncertainty inherent in the question of viability. In the present situation, if we were to declare that a viable fetus should be considered a "person" for purposes of the criminal homicide statutes, our decision would be unconstitutionally vague unless we set some objective legal standard for deciding if the accused knew he was terminating the life of a viable fetus. The opinion of the Kentucky Court of Appeals suggests this can be left to the determination of a jury as a "factual question." As such, and without legal guidelines, the jury would be left to speculate whether the accused knew, or should have known, that he was killing a fetus capable of being born alive. The effect on physicians performing therapeutic abortions in cases where the status of the fetus is in doubt could be profound.

Finally, a finding that a viable fetus should be considered a "person" under Chapter 507, the "Criminal Homicide" statute, runs afoul of the well-recognized rule of statutory construction that "the specific statute controls a more general statute." *Heady v. Commonwealth*, Ky., 597 S.W.2d 613 (1980).

The language of the statutes of this Commonwealth related to abortions in effect at the time of this occurrence, July 5, 1981, specifically cover any criminal liability of the movant if he caused an abortion. KRS 311.750 provides (then and now) that "no person other than a licensed physician shall perform an abortion." In 1981, an abortion was defined in KRS 311.720(1) to cover any "act . . . producing the premature expulsion of the fetus." There was no requirement that expulsion occur immediately or spontaneously. Hollis' conduct was criminal if he intentionally destroyed the fetus making it necessary to expel the fetus by subsequent surgical intervention as occurred in this case. The gravamen of the offense is the *act* causing the delivery of the fetus, not the method of delivery.

In 1982, the statute was amended to expand the definition of "fetus." The word fetus in the 1974 statute, undefined, would be subject to the usual dictionary definition, "the unborn offspring in the most embryonic period after major structures have been outlined (in man from seven or eight weeks after fertilization until birth)." Black's Law Dictionary, 5th Ed., p. 559. Under the 1982 statute, the definition of fetus is expanded to include the embryonic period, "a human being from fertilization until birth." KRS 311.720(5), eff. 7/15/82. KRS 311.-990(14) provided then, as it does now, that any person convicted of violating KRS 311.-750, which covers this case, "shall be imprisoned in the penitentiary for a term of not less than ten (10) nor more than twenty (20) years."

These abortion statutes were established in the Kentucky Penal Code at the same time as the murder statute and existed when that statute was amended. In *City of Bowling Green v. Board of Education*, Ky., 443 S.W.2d 243 (1969), we stated at p. 247:

"(1) That it is the duty of the court to ascertain the purpose of the General Assembly, and to give effect to the legislative purpose if it can be ascertained; (2) that conflicting Acts should be considered together and harmonized, if possible, so as to give proper effect and meaning to each of them; and (3) that as between legislation of a broad and general nature on the one hand, and legislation dealing minutely with a specific matter on the other hand—the specific shall prevail over the general."

Using these standards, the conclusion is inescapable that the legislature intended conduct directed to cause the unlawful abortion of a fetus, viable or not, to be punished under the abortion statutes.

Some of the abortion statutes deal with the subject of "consent" by the mother. But it is nowhere expressed or implied that abortion only occurs where consent is given. Statutes dealing with criminal abortion are concerned with the situation where no consent is given or where consent is unlawful. KRS 311.750 would cover both such situations.

Nor is this a case where, because assault in the first-degree against the mother is also charged, the doctrine of "merger" applies. The standard for determining merger is whether or not the two offenses charged "consist of different elements and is sustained by proof of different facts." *Easley v. Commonwealth*, Ky., 320 S.W.2d 778 (1958). In *Easley*, the Court states at p. 779:

> "The test to determine whether the acts committed at the same time and place constitute one or more offenses is, if proof of what is set out (alleged) in the second indictment made on the trial of the first indictment would sustain it, then the two indictments are for the same offense. If what is set out (alleged) in the second indictment when proved upon the trial of the first will not sustain it, then they are distinct offenses, and the conviction or acquittal of either is not a bar to the other."

It is hardly arguable that proof of assaulting the mother, in and of itself, would not sustain a conviction for aborting the child, and vice versa. In *Commonwealth v. Allen*, 191 Ky. 624, 231 S.W. 41 (1921), this Court held that a husband could be prosecuted under the abortion statute then in effect for "unlawfully, willfully and feloniously using a metal instrument, ... upon the body and person of his wife (named), who was at the time pregnant, during the period of gestation," causing abortion. The question before the Court was whether the wife should be permitted to testify "that her husband (appellee) over her protest and against her will forceably inserted a metal instrument into her private parts, person and body for the purpose of causing a miscarriage of her unborn child (or children), and result of same was a miscarriage." By implication, the Court made it clear beyond question that statutes relating to criminal abortion do not exclude the class of cases where the abortion results from a husband's assault on his wife. The movant Hollis can be prosecuted for violating the statute relating to criminal abortions. At the same time, it follows that the specific statute related to abortions preempts the general statutes related to criminal homicide.

Nothing stated herein is intended to prevent the prosecution of the movant, Robert Lee Hollis, for abortion or for assault in the first degree, or both.

For the reasons stated herein, the decision of the Kentucky Court of Appeals is reversed, and the decision of the trial court in dismissing the indictment for murder is affirmed.

GANT, LEIBSON and STEPHENSON, JJ., concur.

VANCE, J., concurs in results only in a separate concurring opinion in which AKER, J., joins.

STEPHENS, C.J., and WINTERSHEIMER, J., dissent.

WINTERSHEIMER, J., files herewith a dissenting opinion in which STEPHENS, C.J., joins.

VANCE, Justice, concurring.

The majority opinion holds that a person may not be convicted of murder for an intentional act which results in the death of a fetus. I concur with the majority to that extent for the reason that at common law and under the case law of Kentucky as it presently exists there can be no prosecution for murder of a fetus in the absence of proof that the fetus was born alive, breathed and had a complete and separate existence of its own after birth. *Jackson v. Commonwealth*, 265 Ky. 295, 96 S.W.2d 1014 (1936). Regardless of whatever personal philosophy any judge may have, *Jackson, supra*, had not been overruled when the act was committed by Hollis. I believe he was entitled to rely upon the decisions of this court which had not been repudiated.

I do not believe it is necessary or proper to extend the opinion of this court to the other issues discussed in the opinion, and for that reason I concur in the result only.

AKER, J., joins in this concurring opinion.

WINTERSHEIMER, Justice, dissenting.

I must respectfully dissent from the majority opinion because the trial court was in error in dismissing the murder indictment when the only medical evidence indicated that the unborn child was alive.

The deposition of Dr. Nunemaker shows that he definitely considered the child to be alive. He was asked:

Q. In your medical opinion was this 28 to 30 week old fetus a viable living being?

A. Yes.

He repeated and explained his opinion but never changed it, nor deviated from it. Under aggressive cross-examination, the doctor said he called the seven-month-old infant a baby, and stated "it was a living person."

The only fair inference that can be taken from the entire testimony by the physician is that it was his medical opinion that this was a viable fetus that would have lived assuming that the mother had a normal delivery even though the child would have been several weeks premature. There was absolutely no evidence produced before the trial judge to contradict Dr. Nunemaker's testimony.

The trial court would impose the legal definition of a person as stated in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), upon the factual medical opinion as presented by the physician in this case. An extension of such reasoning could in effect permit judges to practice medicine. Personally, I believe that the opinion of a physician is more valuable. Given the choice, I would prefer being treated by a doctor rather than a judge.

Stripped of its rhetoric, this matter is simply a brutal murder committed on an innocent, defenseless victim. It is directly connected to a savage criminal assault on the mother and on the child.

There is no need to speculate as to when life begins. A baby human is biologically little different from a fish, frog or horse. For each life begins at the moment of conception. Here, the child was seven months along in development in the womb; clearly, his individual life had begun. The doctor testified that he was a living person. Even *Roe v. Wade, supra,* tacitly recognizes the viability of the child at 28 weeks.

Consequently it is not really necessary to enter an extended discussion on the legal, moral, theological, medical or philosophical questions in the pro-life/pro-abortion debate. This is a clear case of an unlawful killing of a human, living person as confirmed by the uncontradicted medical evidence in the record. The trial court erred. The Court of Appeals was correct. Accordingly, I must respectfully disagree with the majority of this Court.

It is hypertechnical judicial hairsplitting to abstractly theorize on the meaning of "person," "human being" or "being born alive." It is sematical sophistry of the worst order to deny the equal protection of the criminal law to an unborn living human being.

Those who would do so can find no real refuge in the United States Constitution because that sacred but living document also once was erroneously interpreted to refuse to recognize women and blacks as "legal persons."

The Court of Appeals correctly decided that a viable fetus is a person within the meaning of the Kentucky homicide statute. The common law requirement of a live birth expressed in *Jackson v. Commonwealth,* 265 Ky. 295, 96 S.W.2d 1014 (1936) is not necessarily controlling in the absence of other statutory language. The definition of a person expressed in *Mitchell v. Couch,* Ky., 285 S.W.2d 901 (1955), more correctly indicates the true status of the law at the time the homicide statute was adopted. In that civil case, the Court held that a viable unborn child is a person because biologically speaking such a child is a presently existing person, a living human being.

Biologically speaking, human life begins at the moment of conception. 42 Am. Jur.2d, *Infants* § 2. Medical authority has long recognized that the child is in exist-

ence from the moment of conception. W. Prosser, *Torts* § 55 (4th ed., 1971).

An additional analysis of cases decided in regard to the civil law indicates that for matters related to social security benefits the fact that a worker died before the birth of a child already in being is not a legal or equitable reason to prohibit the child from benefits. Medically speaking, the child was viable from the instant of conception onward. *Wagner v. Finch,* 413 F.2d 267 (5th Cir., 1969). The Supreme Court of Rhode Island has held that an unborn child is a person within the meaning of that state's wrongful death action and damages could be awarded on behalf of the parents of a stillborn child. *Presley v. Newport Hospital,* 117 R.I. 177, 365 A.2d 748 (R.I., 1976).

When the Kentucky Penal Code was enacted, common law crimes were abolished and a liberal construction of the Kentucky law was mandated.

The Kentucky Penal Code is based upon and frequently refers to the Model Penal Code. The Model Code indicates that for purposes of homicide, a human being means a person who has been born alive. A.L.I. Model Penal Code, 1962. It is fair to say that this definition was considered by the drafters of the Kentucky code but was not adopted. Consequently I conclude that the commentary reflects a legislative intent not to consider the concept of being born alive as previously followed to apply to the Kentucky code.

Crimes relating to the death of an unborn child do not necessarily fall within the exclusion of the abortion statutes. The Kentucky abortion laws were adopted in 1974 and are not part of the penal code which was enacted in 1971. The Kentucky abortion statutes relate to protection for the consenting mother and her doctor without regard to the penal code. The homicide statutes and the abortion statutes do not reflect exclusive punishment for criminal conduct resulting in the death of an unborn child. The legislature intended that either could apply depending on the facts. Prosecutors generally have the discretion to decide on a particular charge depending on the facts of a situation. These facts, if they involve a felony, must be presented to a grand jury. Here that was done and the grand jury decided that it was felony murder.

This is not a situation in which the specific controls the general. Here we have parallel laws regulating different kinds of individual human behavior. The choice of making the charge was clearly within the authority of the prosecutor.

The facts of this case do not fit within the abortion statute. The actions of the father did not actually produce the premature expulsion of the unborn child. The child was not expelled; it was surgically removed after being killed by its father. None of the other elements generally associated with abortion are present here. There was no consent by the pregnant woman, much less the written informed consent required by the law. Here no physician or hospital was involved, and the unborn child was not within the constitutionally court-created period of nonviability. If the defendant had shot the unborn child with a gun while it was still in the mother's womb, it would hardly be thought of as an abortion. The only similarity between abortion and the facts of this case is that an unborn child was involved. We should not interpret the abortion statute as the exclusive punishment for this course of conduct. The legislature has provided punishment for somewhat similar conduct under one or more statutes. *See, Commonwealth v. McKinney,* Ky.App., 594 S.W.2d 884 (1979).

If we are to follow the Michigan example in *People v. Guthrie,* Mich.App., 97 Mich. App. 226, 293 N.W.2d 775 (1980), then perhaps additional legislation is needed to clearly express the public policy of Kentucky in this type of incident. The Michigan court acknowledged the advances in medical science and recognized that the born-alive rule is outmoded, archaic and no longer served a useful purpose. However, it refused to extend the civil law definition of person to criminal law. That may be one of the reasons why the public in general has

a jaundiced view of the technical distinctions indulged in by the courts.

It is my belief that Kentucky does not necessarily have to go to such lengths. The legislature indicated that the provisions of the penal code should be liberally construed. Their purpose was to repudiate the common-law principle of a strict construction of the penal laws. The *Mitchell v. Couch, supra,* case was decided almost twenty years before the adoption of the penal code. It has been followed in *City of Louisville v. Stuckenborg,* Ky., 438 S.W.2d 94 (1968); *Orange v. State Farm Mutual Automobile Ins. Co.,* Ky., 443 S.W.2d 650 (1969), and *Rice v. Rizk,* Ky., 453 S.W.2d 732 (1970). The existence of life in an unborn child at this stage of development is a fundamental truth that does not require sophisticated or hypertechnical interpretation. The legislators, as well as the general public, should have reasonable acquaintance with the civil laws of Kentucky. It is a frequent presumption that the legislature is aware of the law at the time it enacts any other law. Therefore it is reasonable to believe that the Kentucky legislature intended the concept of personhood be extended to the criminal law. It is easy to argue that civil cases have no technical application to criminal statutes. However we believe that the legislative intent has been sufficiently manifested in Kentucky to include a fabric of the law that is uniform and whole and not unduly fragmented.

The interpretation of the word "person" in the Kentucky homicide statute by the Court of Appeals is not constitutionally prohibited under the ex post facto concept. The interpretation clarified the existing law of this Commonwealth. I believe the words "person" and "human being" as applied to homicide can be easily harmonized. Certainly at the very least, our legal system should try to keep up with the advances we have made in medical technology. In applying the ex post facto doctrine, it is necessary to carefully examine the conduct of the defendant in relation to the charges against him. Here his brutal conduct is obvious.

The construction of KRS 507.020 that includes an unborn child as a person or human being who can be the victim of a homicide does not make the statute unconstitutionally void for vagueness. It does not fail to give adequate notice or to promote adequate standards. Criminal responsibility does not attach where one could not reasonably understand that his contemplated conduct is unlawful. In determining the sufficiency of such notice, a statute must be examined in the light of the conduct of the defendant. *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). In this case there is little doubt that the father realized he was taking the life of his unborn child, against the laws of this state.

I do not believe that the factual pattern presented by this case is too difficult for a jury to comprehend. The question of viability can easily be left to the trier of fact on the basis of the evidence presented. It is done so routinely in the courts of Kentucky now in civil cases. Applying the same concept of viability to the homicide statutes presents no new difficulty. Such a position is not new to the field of homicide law generally. *See,* California Penal Code § 187 (1971); Michigan Comp. Laws Ann. § 750.322 (1968); Pa.Stat.Ann., Title 35 § 6605(d), Purdon (1977).

This Commonwealth does have a legitimate interest in the protection of human life, which requires treatment of a viable fetus as a person. Whether a criminal defendant intended to cause the death of the unborn child or injury or death to the mother is a factual question.

The circuit court was in error in dismissing the murder indictment because the only medical evidence indicates that the baby was a living person. This matter was clearly a jury question. The decision of the Court of Appeals should be affirmed.

STEPHENS, C.J., joins in this dissent.